UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Sang Shihong, Individually and on Behalf of All Others Similarly Situated, | Civil File No. 09-cv-2856 (PJS/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS** |
| SUPERVALU INC., Jeff Noddle, and Pamela K. Knous, | |
| Defendants. | |

## INTRODUCTION

Earnings guidance on what a company hopes to achieve is a classic forward-looking statement. Here, Plaintiff baldly concludes that the forward-looking guidance given on April 23, 2009 of what Defendant SUPERVALU INC. ("SUPERVALU" or "the Company") hoped it could achieve in the coming fiscal year (a year that will end on February 27, 2010) was a material misrepresentation that constituted securities fraud. Plaintiff's theory of fraud ignores black letter law, fails to acknowledge the tailored cautionary statements made to the market that changing economic conditions might have unpredictable effects on consumer spending, and is not based on a single, specific fact. Instead, Plaintiff seizes on a June 24, 2009 press release that informed the market that, due to a "tougher than expected business environment," SUPERVALU's earnings "will be substantially below First Call consensus earnings," and that SUPERVALU would "update annual guidance," and concludes the bad news must be due to fraud. But a

disappointing press release or failing to achieve earnings guidance does not equal securities fraud.  Plaintiff must allege the who, what, when, where, and how of the alleged fraud with specific facts.  Plaintiff has failed to meet the most fundamental requirements under the PSLRA.  Accordingly, the Complaint should be dismissed with prejudice.

<u>**STATEMENT OF FACTS**</u>[1]

## I.      THE DEFENDANTS

SUPERVALU is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  Compl. ¶ 8; 2009 Form 10-K (filed on April 28, 2009) at 1 (Ex. 6).[2]  SUPERVALU is one of the largest companies in the United States grocery channel.  SUPERVALU conducts its retail operations under banners such as Cub Foods, Jewel-Osco, and Albertson's.  2009 Form 10-K at 6 (Ex. 6).  The Company also provides supply chain services, primarily through its wholesale distribution business.  Id.

Jeff Noddle is SUPERVALU's Executive Chairman.  For most of the proposed class period, he was SUPERVALU's Chief Executive Officer and Chairman.  Compl. ¶ 9.  Pamela K. Knous is SUPERVALU's Chief Financial Officer, Principal Accounting Officer, and Executive Vice-President.  Compl. ¶ 10.

---

[1]  The Statement of Facts is drawn from (1) the Complaint, the allegations of which are assumed to be true for purposes of this motion only; (2) various public documents, many of which are incorporated herein by reference; and (3) other materials embraced by the Complaint.  Such documents can be considered at this stage.  <u>See</u> <u>In re K-tel Int'l, Inc. Sec. Litig.</u>, 300 F.3d 881, 889 (8th Cir. 2002).

[2]  All exhibits referenced herein are attached to the Declaration of Peter W. Carter.

## II.      THE FISCAL 2010 GUIDANCE

On April 23, 2009, SUPERVALU announced its financial results for the fourth

quarter and full fiscal year of 2009 (which ended on February 28, 2009).  April 23, 2009

Form 8-K (attaching April 23, 2009 Press Release) (Ex. 5).  At the same time it

announced 2009 fiscal results, SUPERVALU offered guidance for the 2010 fiscal year:

> The Company expects to generate fiscal 2010 earnings per
> diluted share on a GAAP basis within a range of $2.44 to
> $2.59 per diluted share, including charges related to timing of
> store closure activities of $20 million pre-tax, or $0.06 per
> share, which are part of the previously announced store
> closure and cost mitigation efforts.

Id.  The press release specifically cautioned that it included forward-looking information

covered by the safe harbor provisions of the PSLRA.  It stated:  "[T]he matters set forth

in this news release, particularly those pertaining to SUPERVALU's expectations or

future operating results . . . are forward-looking statements within the meaning of the

'safe harbor' provisions of the Private Securities Litigation Reform Act of 1995."  Id.

The press release also stated, "These forward-looking statements are subject to

risks and uncertainties that may cause actual results to differ materially, including the

impact of economic and industry conditions . . . ."  Id.  It also incorporated by reference

"other risk factors relating to our business or industry as detailed from time to time in

SUPERVALU's reports filed with the SEC."  Id.  The incorporated risk factors

specifically noted that "the recent turmoil in the financial markets may have an adverse

effect on the U.S. and world economy, which could negatively impact consumer

spending patterns."  Second Quarter 2009 Form 10-Q (filed October 16, 2008) at 25

(Ex. 3).  Accord Third Quarter 2009 Form 10-Q (filed January 8, 2009) at 25 (Ex. 4)

("See the discussion of risk factors in [the Second Quarter 2009 Form 10-Q], which

describe various risks and uncertainties to which the Company is or may become

subject.").

## III.   THE NOTE OFFERING

On April 30, 2009, SUPERVALU announced a $500 million note offering, the

proceeds of which would be used to pay outstanding debt.  See Form S-3 (filed on April

30, 2009) at 18 (Ex. 7).  In the note offering documents, SUPERVALU expressly warned

that one risk of investing was that "[g]eneral economic conditions, which are largely out

of our control, may adversely affect our financial condition and results of operations."

Id. at 9.  Very soon thereafter, SUPERVALU announced that the size of the offering

would be raised from $500 million to $1 billion "[i]n response to market demand."

April 30, 2009 Press Release (Ex. 8).  On May 7, 2009, SUPERVALU announced the

closing of the note offering.  May 7, 2009 Press Release (Ex. 10).

## IV.   SUPERVALU COMMENTS ON THE FIRST QUARTER

On June 24, 2009, SUPERVALU announced that first quarter 2010 earnings

would "be substantially below First Call consensus earnings for the quarter."

June 24, 2009 Form 8-K (attaching June 24, 2009 Press Release) (Ex. 11).  Current

SUPERVALU Chief Executive Officer Craig Herkert commented that "consumers have

become more value focused and cautious in their spending which has pressured sales and

margins greater than anticipated."  Id.  Herkert went on to say that SUPERVALU would

issue revised guidance for fiscal 2010 on July 28, 2009, with the Company's first quarter earnings release. Id.

The market reacted swiftly to this announcement. SUPERVALU stock, which traded at $15.56 a share on June 23, 2009, fell to $13.81 a share on June 24. Compl. ¶ 17. During the ninety-day "bounce back" period provided for in the PSLRA, 15 U.S.C. § 78u-4(e)(1), which began on June 24, 2009 and ended on September 21, 2009, SUPERVALU stock closed as high as $16.32 a share, seventy-six cents higher than its close on June 23. See Stock Price History (Ex. 12). Nevertheless, fewer than three weeks after the June 24 Press Release, in response to the drop in SUPERVALU's stock price, Plaintiff filed this lawsuit in the United States District Court for the Southern District of New York on behalf of a putative class of shareholders who purchased SUPERVALU stock from April 23, 2009 through June 23, 2009. The case was transferred to this Court on October 15, 2009.

## ARGUMENT

## I.     THE LEGAL STANDARD

The Private Securities Litigation Reform Act ("PSLRA") imposes a heightened pleading standard for securities fraud claims. See In re K-tel, Inc. Sec. Litig., 300 F.3d 881, 889 (8th Cir. 2002); In re Nash Finch Co. Sec. Litig., 323 F. Supp. 2d 956, 960 (D. Minn. 2004). Under the PSLRA, a plaintiff must plead particular facts demonstrating the "who, what, when, where, and how" of the alleged fraud. K-tel, 300 F.3d at 890; see also Fed. R. Civ. P. 9(b) ("In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."). Courts must also "disregard 'catch-all' or

'blanket' assertions that do not live up to the particularity requirements of the [PSLRA]." Kushner v. Beverly Enters., Inc., 317 F.3d 820, 824 (8th Cir. 2003).  Moreover, a plaintiff must allege facts that give rise to a strong inference of scienter.  See In re Ceridian Corp. Sec. Litig., 504 F. Supp. 2d 603, 615 (D. Minn. 2007), aff'd, 542 F.3d 240 (8th Cir. 2008).  Under this standard, the Complaint fails to state a claim and must be dismissed.

## II. PLAINTIFF'S COMPLAINT FAILS TO ADEQUATELY PLEAD THE ELEMENTS OF A SECTION 10(b) CLAIM

The elements of a claim for fraud under Section 10(b) of the Securities Exchange Act of 1934 or Rule 10b-5 include:  (1) the misrepresentation or omission of a material fact; (2) made with scienter; (3) that causes economic loss.  See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); In re Synovis Life Techs., Inc. Sec. Litig., No. 04-3008, 2005 WL 2063870, at *3 (D. Minn. Aug. 25, 2005); Nash Finch, 323 F. Supp. 2d at 960.  The Complaint fails as a matter of law to state a claim with regard to each element.

### A. Plaintiff's Theory Of Fraud Is Barred By The PSLRA Because The Statutory Safe Harbor Protects The Statements at Issue as a Matter of Law

Under the PSLRA, certain alleged misstatements are absolutely protected by a "safe harbor" provision.  See 15 U.S.C. § 78u-5(c)(1).  Under the safe harbor provision, forward-looking statements that are (1) identified as such and (2) accompanied by meaningful cautionary statements cannot serve as a basis for liability.  Id.  In addition, a complaint that alleges only immaterial misrepresentations presents an "insuperable bar to relief" and must be dismissed.  In re Amdocs Ltd. Sec. Litig., 390 F.3d 542, 547 (8th Cir.

2004); K-tel, 300 F.3d at 897 (quoting Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997)).

Here, Plaintiff fails to plead any specifics as to the actual statements he believes are misrepresentations.  The general gravamen of the Complaint, however, is that SUPERVALU's guidance for what it hoped it could achieve in fiscal 2010 was a material misrepresentation.  This fails as a matter of law.

The PSLRA specifically defines "statement[s] of future economic performance" and "any statement of the assumptions underlying or relating to" projected revenues, earnings, or future economic performance as inactionable forward-looking statements. 15 U.S.C. § 78u-5(i)(1)(A), (C)-(D).  Statements of projected earnings are protected under the safe harbor provision of the PSLRA.  See In re Nash Finch Co., 502 F. Supp. 2d 871-872 (D. Minn. 2007).

Indeed, at the time it issued guidance for fiscal 2010, SUPERVALU clearly stated that its guidance included forward-looking statements covered by the PSLRA's safe harbor provisions.  The April 23, 2009 press release expressly provides that statements relating to "SUPERVALU's expectations or future operating results" are "forward-looking statements within the meaning of the 'safe harbor' provisions of the [PSLRA]" and thus "subject to certain risks and uncertainties . . . ."  April 23, 2009 Form 8-K (attaching April 23, 2009 press release) (Ex. 5).  Any statements about SUPERVALU's future performance and expectations are entitled to protection under the PSLRA's safe harbor provisions.

Moreover, the guidance for fiscal 2010 was given with meaningful cautionary statements.  The press release specifically cautions as follows:

> These forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially, including *the impact of economic and industry conditions*, competition, food and drug safety issues, the integration of Albertsons operations, store expansion and remodeling, liquidity, labor relations issues, escalating costs of providing employee benefits, regulatory matters, self insurance, legal and administrative proceedings, information technology, security, severe weather, natural disasters and adverse climate changes and accounting matters . . . .

Id. (emphasis added).  The general condition of the economy – the root cause of the change in consumer spending habits – is specifically and particularly noted in the press release.

Furthermore, the press release incorporates the full discussion of risk factors set forth "from time to time in SUPERVALU's reports filed with the SEC."  Id. SUPERVALU's Quarterly Reports and Annual Reports filed prior to and during the class period specifically note that the current state of the economy might have an adverse effect on consumer spending habits.  See, e.g., 2009 Form 10-K at 11 (filed April 28, 2009) (Ex. 6); Third Quarter 2009 Form 10-Q at 25 (filed Jan. 8, 2009) (Ex. 4); Second Quarter 2009 Form 10-Q at 25 (filed Oct. 16, 2008) (Ex. 3); First Quarter 2009 Form 10-Q at 23 (filed July 23, 2008) (Ex. 2); 2008 Form 10-K at 8 (filed April 23, 2008) (Ex. 1).[3]

---

[3]   SEC filings incorporated by reference are sufficient to invoke the safe harbor protection for forward-looking statements contained in the PSLRA.  See In re NVE Corp. Sec. Litig., 551 F. Supp. 2d 871, 892-93 (D. Minn. 2007); Yellen v. Hake, 437 F. Supp. 2d 941, 963-64 (S.D. Iowa 2006) (collecting cases so holding).

The Company's Form 10-Qs that had been incorporated by reference in the press release specifically cautioned:

> **General economic conditions, including increases in energy and commodity prices, that are largely out of the Company's control may adversely affect the Company's financial condition and results of operations.**
>
> The Company's Retail food and Supply chain services businesses are sensitive to changes in general economic conditions, both nationally and locally. Recessionary economic cycles, higher interest rates, higher fuel and other energy costs, inflation, increases in commodity prices, higher levels of unemployment, higher consumer debt levels, higher tax rates and other changes in tax laws or other economic factors that may affect consumer spending or buying habits could adversely affect the demand for products the Company sells in its stores or distributes to its retail customers. In addition, the recent turmoil in the financial markets may have an adverse effect on the U.S. and world economy, which could negatively impact consumer spending patterns. There can be no assurances that government responses to the disruptions in the financial markets will restore consumer confidence.
>
> Furthermore, the Company could experience reduced traffic in its stores or stores that it supplies, or limitations on the prices the Company can charge for its products, either of which could reduce the Company's sales and profit margins and have a material adverse affect on the Company's financial condition and results of operations. Also, economic factors such as those listed above and increased transportation costs, inflation, higher costs of labor, insurance and healthcare, and changes in other laws and regulations may increase the Company's cost of sales and the Company's operating, selling, general and administrative expenses, and otherwise adversely affect the financial condition and results of operations of the Company's Retail food and Supply chain services businesses.

Second Quarter 2009 Form 10-Q at 25 (filed Oct. 16, 2008) (Ex. 3); Third Quarter 2009 Form 10-Q at 25 (filed Jan. 8, 2009) (Ex. 4).  Because Defendants expressly cautioned the market that economic factors could affect consumer spending or buying habits, which in turn may adversely affect the Company's results of operations, its guidance of future earnings falls within the safe harbor.  See Amdocs, 390 F.3d at 548.

Plaintiff generally alleges that Defendants are not entitled to any safe harbor for forward-looking statements because they knew the forward-looking statements were false when made.  Compl. ¶ 18.  However, as with Plaintiff's other allegations, this conclusory allegation lacks even one fact to support it.  This naked assertion falls short of the particularity required under the PSLRA.  See In re Navarre Corp. Sec. Litig., 299 F.3d 735, 742 (8th Cir. 2002).  Because, as explained in more detail below, Plaintiff fails sufficiently to plead that any statement was made with actual knowledge that it was false or misleading, the safe harbor provision protects Defendants' forward-looking statements.  See In re Harley-Davidson, Inc. Sec. Litig., No. 05-C-0547-CNC, -- F. Supp. 2d. --, 2009 WL 3233754, at *29 (E.D. Wis. Oct. 8, 2009).  Accordingly, the Complaint should be dismissed on this basis alone.[4]

Because Plaintiff's theory of fraud fails as a matter of law, the Complaint should be dismissed with prejudice.

---

[4]   The common-law bespeaks caution doctrine similarly compels dismissal in light of the cautionary statements.  See Amdocs, 390 F.3d at 548 (affirming dismissal of a securities fraud complaint under the bespeaks caution doctrine when the cautionary statements were directly related to the subject matter of the alleged misrepresentations); Parnes, 122 F.3d at 547 (same).

## B.     The Complaint Does Not Plead Misrepresentations Or Omissions With Particularity

A complaint cannot rest on mere allegations of fraud.  <u>See</u> <u>Navarre</u>, 299 F.3d at

742.  "[R]ote allegations that the defendants knowingly made false statements of material

fact" will not satisfy the PSLRA.  <u>Id.</u> at 745.  Instead a plaintiff must "specify each

statement alleged to have been misleading" and "the reason or reasons why the statement

[was] misleading" when made.  15 U.S.C. § 78u-4(b)(1); <u>see also</u> <u>Ceridian</u>, 504 F. Supp.

2d at 615; <u>aff'd</u> 542 F.3d 240 (8th Cir. 2008).

The Complaint nakedly asserts that Defendants "made various false statements of

material facts and omitted to stated [sic] materials," Compl. ¶ 28, and goes on to allege

that these "statements [were] made . . . to the SEC, securities analysts and members of the

investing public, including plaintiff."  Compl. ¶ 30.  But nowhere does the Complaint

identify *which* specific statements are allegedly false and misleading, *why* the statements

were false and misleading, or *how* Defendants knew the statements were false and

misleading *when* they were made.  For this reason alone, the Complaint should be

dismissed.  <u>See</u> 15 U.S.C. § 78u-(4)(b)(1); <u>K-tel</u>, 300 F.3d at 890; <u>see also</u> <u>In re 2007</u>

<u>Novastar Fin., Inc. Sec. Litig.</u>, 579 F.3d 878, 882-83 (8th Cir. 2009) (upholding the

district court's dismissal of a securities fraud complaint that gave no "indication as to

what specific statements . . . [were] alleged to be false or misleading").

The Complaint is a classic example of an attempt to plead fraud by hindsight,

something this Court should not countenance.  <u>See</u> <u>K-tel</u>, 300 F.3d at 891.  Plaintiff's

theory amounts to little more than speculation that, at the time of the April 23 Press

Release, Defendants somehow knew the Company's future performance would be worse than they were publicly stating because they somehow knew the economic recovery would take longer than anticipated.  The Eighth Circuit has observed that "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."  <u>Navarre</u>, 299 F.3d at 743 (quotation and citation omitted).  Plaintiff does not allege a single specific fact in support of this speculation.  Because the Complaint fails to plead the "why," "when," and "how" of the alleged fraud, it must be dismissed.

### C.    The Complaint Does Not Allege With Particularity Facts That Give Rise To A Strong Inference of Scienter

Not only does the Complaint fail to specifically identify allegedly fraudulent statements and why each statement was allegedly fraudulent when made, it also fails to plead "with adequate particularity facts giving rise to a *strong inference* that the defendant acted with the requisite state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).  The required state of mind is scienter, the "intent to deceive, manipulate, or defraud."  <u>Kushner</u>, 317 F.3d 827.  The Supreme Court and the Eighth Circuit have made clear that in order to meet the pleading requirements of the PSLRA and thereby survive a motion to dismiss, "[n]ot only must a plaintiff state with particularity facts giving rise to an inference of scienter that is strong when viewed in isolation, the inference 'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  <u>In re Ceridian Corp. Secs. Litig.</u>, 542 F.3d 240, 244 (8th Cir. 2008) (quoting <u>Tellabs Inc. v. Makor Issues & Rights, Ltd.</u>,

551 U.S. 308, 314 (2007)).  Bald statements of knowledge do not meet this burden.  <u>See</u> <u>Navarre</u>, 299 F.3d at 743.

The scienter requirement can be met in three ways:  (1) pleading specific facts demonstrating intentional wrongdoing or actual knowledge; (2) pleading specific facts giving rise to a strong inference of recklessness; or (3) pleading specific facts of unusual or heightened motive and opportunity.  <u>See</u> <u>K-tel</u>, 300 F.3d at 893-94.  When there is no showing of motive and opportunity, other scienter allegations must be particularly strong. <u>See</u> <u>K-tel</u>, 300 F.3d at 893-94.  The Complaint fails to meet this standard; accordingly, dismissal is warranted.

1.   <u>The Desire to Close the Note Offering Does Not Constitute Unusual or Heightened Motive And Opportunity Giving Rise to a Strong Inference of Scienter as a Matter of Law.</u>

To establish a strong inference of scienter by unusual or heightened motive and opportunity, a plaintiff "must assert concrete and personal benefit to the individual defendants resulting from fraud."  <u>K-tel</u>, 300 F.3d at 894.  It is well-established that "motives generally possessed by all corporate directors and officers are insufficient as a matter of law."  <u>Id.</u>  Plaintiff's only allegation of motive is that Defendants wanted to close a $1 billion note offering, and the success of the offering was dependent on fraudulently positive guidance for the 2010 fiscal year.  Compl. ¶¶ 14, 29.  But the desire to complete an offering is common to all corporate officers, and Courts have therefore consistently held such allegations are insufficient to establish scienter as a matter of law.

In <u>GSC Partners CDO Fund v. Washington</u>, the Third Circuit assessed whether Plaintiff's allegations of Defendants' alleged desire to complete a note offering was

sufficient to plead motive and opportunity under the heightened pleading requirements of

the PSLRA.  <u>See</u> 368 F.3d 228, 237 (3d Cir. 2004).  The Third Circuit held that such

allegations were too general to support a strong inference of scienter because "[i]n every

corporate transaction, the corporation and its officers have a desire to complete the

transaction."  <u>Id.</u>; <u>see also</u> <u>Cozzarelli v. Inspire Pharms. Inc.</u>, 549 F.3d 618, 617 (4th Cir.

2008) (holding that "a strong inference of fraud does not arise merely from seeking

capital" because "the motivation[] to raise capital . . . [is] common to every company");

<u>Sloane Overseas Fund, Ltd. v. Sapiens Int'l. Corp., N.V.</u>, 941 F. Supp. 1369, 1377

(S.D.N.Y.1996) (allegations that defendant bank "was a founder, a substantial creditor,

and a shareholder" of company whose notes were sold in the offering and, therefore, "had

ample motive to inflate [the company's] financial soundness to ensure a successful and

profitable offering" held inadequate to allege scienter); <u>cf.</u> <u>In re Cerner Corp. Sec. Litig.</u>,

425 F.3d 1079, 1085 (8th Cir. 2005) ("The desire to make a company seem more

profitable is a desire universally held among corporations and their executives, and thus

is insufficient to prove scienter as a matter of law.") (quotation omitted); <u>K-tel</u>, 300 F.3d

at 894 ("[U]nsupported allegations with regard to motives generally possessed by all

corporate directors and officers are insufficient [to establish scienter] as a matter of

law.").

       2.      <u>The Complaint's Conclusory Allegations of Knowledge and
Recklessness are Insufficient to Plead Scienter.</u>

Because Plaintiff does not allege with particularity any facts demonstrating

unusual or heightened motive and opportunity, the other scienter allegations in the

Complaint must be "particularly strong." K-tel, 300 F.3d at 894. The only other purported scienter allegation is found in Paragraph 30 of the Complaint, and is conclusory, speculative, and inadequate as a matter of law.

Paragraph 30 alleges in part that "Defendants had actual knowledge of the material omissions and/or material statements set forth above . . . or, in the alternative, acted with reckless disregard for the truth." This allegation is pure conclusion, baldly asserted with no facts to support it – exactly the type of pleading prohibited by the PSLRA. See Navarre, 299 F.3d at 742.

Because the Complaint fails to adequately allege scienter under any test, it must be dismissed.

### D.  THE COMPLAINT FAILS TO ADEQUATELY PLEAD ECONOMIC LOSS OR LOSS CAUSATION

Economic loss and loss causation are essential elements of a securities fraud claim. See Dura, 544 U.S. at 341-42. However, unlike the allegations relating to fraudulent statements and scienter, economic loss and loss causation are governed by Fed. R. Civ. P. 8, which provides for notice pleading. Id. at 346. Thus, this Court must evaluate Plaintiff's allegations of economic loss and loss causation under the fact-based plausibility standard of Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009). As the Iqbal Court stressed, a well-pleaded complaint "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," 129 S. Ct. at 1949, and must instead "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at

1950.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 1949; see also Dura, 544 U.S. at 347 ("[I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.")  As demonstrated below, Plaintiff's accusations of economic loss and loss causation do not meet this standard.  Accordingly, the Complaint should be dismissed.

The only general allegations of causation and loss in the Complaint are found in Paragraphs 17 ("As a result, the Company's share price dropped . . . ."), 31 ("As a result of the foregoing, the market price of SUPERVALU securities was artificially inflated during the Class Period."), 33 ("Defendants' concealment of this material information[5] served only to harm plaintiff . . . ."), and 34 ("As a result of the wrongful conduct alleged herein, plaintiff . . . [has] suffered damages . . . .").  Plaintiff cannot state a claim by rotely reciting the elements of securities fraud.  This is true for two reasons:  First, even under the notice pleading standard of Fed. R. Civ. P. 8, such "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" are not sufficient to state a claim.  Iqbal, 129 S. Ct. at 1949.  Even under the pre-Twombly/Iqbal understanding of Rule 8, courts were "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."  Wiles v. Capitol Indemnity Corp., 280 F.3d 868, 870 (8th Cir. 2002).  Sweeping, unsupported assertions

---

[5]  The Complaint fails to identify or specify any "material information" whatsoever.

and unwarranted inferences regarding the timing and magnitude of stock price drops do not substitute for *facts* that might give Defendants notice of Plaintiff's claims.

Second, Plaintiff's boilerplate accusations, if held sufficient, would render <u>Dura</u> meaningless. The holding of <u>Dura</u> is based, in part, upon the requirement to plead an "actual economic loss," 544 U.S. at 344, and the requirement that a defendant be given "fair notice" of that loss. <u>Id.</u> at 346 (quotation omitted). The legal conclusion that Plaintiff suffered a loss caused by defendants is insufficient. The Eighth Circuit recently addressed similar allegations in <u>McAdams v. McCord</u>, 584 F.3d 1111 (8th Cir. 2009). In that case, the district court dismissed the plaintiff's securities complaint for failure to plead loss causation, and the Eighth Circuit upheld the dismissal. It found the complaint's broad allegation that "as a direct and proximate result of Defendants' fraudulent misrepresentations and omission of material facts, Plaintiffs have been damaged" was a "threadbare, conclusory statement" insufficient to allege loss causation. <u>McAdams</u>, 584 F.3d at 1114. The court further noted that a complaint rotely alleging damages caused by "artificially inflated prices . . . is insufficient under <u>Dura</u>." <u>Id.</u> at 1115, <u>see also</u> <u>Dura</u>, 544 U.S. at 340 (allegation that "plaintiffs suffered 'damage[s]' thereby" held insufficient to state a claim). Because Plaintiff has not sufficiently pleaded economic loss and loss causation, the Complaint should be dismissed.

## III.     THE SECTION 20(a) CLAIM MUST ALSO BE DISMISSED

The Complaint also alleges a claim against Defendants Noddle and Knous under Section 20(a) of the Exchange Act. Because Plaintiff has failed to state a claim for securities fraud against Defendants, there can be no secondary liability for Defendants

Noddle and Knous as allegedly "controlling" persons.  See Parnes, 122 F.3d at 550 n.12

(citing Van Dyke v. Coburn Enters., Inc., 873 F.3d 1094, 1100 (8th Cir. 1989)); Nash

Finch, 323 F. Supp. 2d at 961 (noting that "plaintiffs' Section 20(a) claim is simply

derivative of their defective Section 10(b) claim").  Accordingly, the Section 20(a) claim

should also be dismissed.

**CONCLUSION**

For the reasons set forth above, Defendants respectfully request that this Court

dismiss the Complaint with prejudice.

Dated:  December 28, 2009                     DORSEY & WHITNEY LLP


                                              By   s/Peter W. Carter _____
                                                    Peter W. Carter #0227985
                                                    carter.peter@dorsey.com
                                                    Kristina W. Carlson #0319338
                                                    carlson.kristina@dorsey.com
                                                    Charles K. LaPlante #0389005
                                                    laplante.charlie@dorsey.com
                                              Suite 1500, 50 South Sixth Street
                                              Minneapolis, MN 55402-1498
                                              Telephone:  (612) 340-2600

                                              *Attorneys for Defendants*